UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
P.C. AND M.C., ON BEHALF OF K.C.,
A STUDENT WITH A DISABILITY,

                    Plaintiffs,

          -against-                     MEMORANDUM AND ORDER
                                        09-CV-1204 (JS)(ETB)

OCEANSIDE UNION FREE SCHOOL
DISTRICT,

                    Defendant.
----------------------------------X
APPEARANCES:
For Plaintiffs:     Anton G. Papakhin, Esq.
                    Tikhomirov & Roytblat PLLC
                    1400 Avenue Z, Suite 403
                    Brooklyn, NY 11235

For Defendant:      Laura A. Ferrugiari, Esq.
                    Frazer & Feldman
                    1415 Kellum Place
                    Garden City, NY 11530-1604

SEYBERT, District Judge:

          Pending before the Court are a motion for summary

judgment filed by Oceanside Union Free School District ("Oceanside"

or "Defendant") seeking dismissal of every claim contained within

the Complaint filed by P.C. and M.C. on behalf of K.C.

("Plaintiffs") (Docket Entry 25) and a cross motion for summary

judgment filed by Plaintiffs (Docket Entry 26). Plaintiffs brought

this action against Oceanside requesting a _de_ _novo_ review of the

refusal of a New York State Review Officer ("SRO") to classify K.C.

with an emotional disturbance pursuant to the Individuals with

Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §

1400(d)(1)(A). The Complaint also includes a claim pursuant to

Section 504 of the Rehabilitation Act of 1973, 20 U.S.C. §§ 701-796(1) ("Section 504"). For the reasons discussed below, Defendant's motion is GRANTED, Plaintiffs' motion DENIED.

<u>BACKGROUND</u>

Defendant Oceanside receives federal financial assistance and is therefore required by law to provide Free Appropriate Public Education ("FAPE") to disabled students residing in its district. Plaintiffs' Local Rule 56.1 Statement ("Pls. Stmt.") ¶ 88.

Beginning in the 7th grade (2004-2005), and continuing through the 8th grade, K.C., a pupil in the Oceanside School District, started receiving failing grades in his classes. Defendant's Local Rule 56.1 Statement ("Def. Stmt.") ¶ 6; Pls. Stmt. ¶ 6. Coinciding with his declining academic performance, in the 7th grade K.C. also began smoking marijuana in the amount of three grams per day (sometimes laced with cocaine), as well as abusing alcohol and prescription medications. Def. Stmt. ¶ 3; Pls. Stmt. ¶ 3. By the time he had reached the 8th grade, he was reportedly smoking one half to three-quarters of an ounce of marijuana daily. Def. Stmt. ¶ 4; Pls. Stmt. ¶ 4.

Concerned about K.C.'s alarming deterioration, his parents requested on December 9, 2004 that Oceanside conduct a psychological evaluation of their child. Def. Stmt. ¶ 7; Pls. Stmt. ¶ 7. Oceanside obliged, evaluating K.C.'s social and psychological history, observing him in class, and soliciting

information regarding his academic performance from his teachers. Id. Among other things, this effort revealed that K.C.'s overall cognitive functioning was average; his processing skills were in the borderline range; his decoding, math, spelling, and listening comprehension skills were average; and his oral expression skills were in the superior range. Def. Stmt. ¶¶ 8-10; Pls. Stmt. ¶¶ 8-10. Armed with these results, and with the knowledge that K.C. was absent from and failing a number of classes, on March 1, 2005, the Committee on Special Education ("CSE") for the district determined that although K.C. was not eligible for special education, he would be afforded more liberal testing accommodations, pursuant to Section 504. Def. Stmt. ¶ 11; Pls. Stmt. ¶ 11. The Plaintiffs never challenged the March 1 meeting in any respect. Def. Stmt. ¶ 12; Pls. Stmt. ¶ 12.

On August 22, 2005, K.C.'s parents placed him in a drug treatment program at Glen Cove Community House ("GCCH"), where his admission diagnoses included abuse of alcohol, cannabis, opiates, and amphetamines; attention deficit hyperactivity disorder; and "parent-child relational problem." Def. Stmt. ¶ 13; Pls. Stmt. ¶ 13. During his stay at GCCH, K.C. underwent weekly individual therapy, bi-weekly family therapy, and daily group and therapeutic and psychiatric services; Oceanside covered K.C.'s education in this period, which comprised ten hours of instruction per week. Def. Stmt. ¶ 15; Pls. Stmt. ¶ 15. For all of his therapy, however,

K.C. continually tested positive for marijuana use, refused to be tested on other occasions, and through his own research he learned how to foil the drug tests. Def. Stmt. ¶ 16; Pls. Stmt. ¶ 16. For this reason and others, GCCH's coordinator wrote to Defendant's Assistant Superintendent for Special Education and Pupil Services to explain why K.C. was being expelled from GCCH. Def. Stmt. ¶ 20; Pls. Stmt. ¶ 20. "K.C.", he wrote, "is presently smoking marijuana, disobeying house and program rules and taking off for hours at a time." Def. Stmt. ¶ 19.

On March 17, 2006, and in response to his ongoing drug use and increasingly violent behavior, K.C.'s parents unilaterally placed him in a private residential preparatory school sited in Hancock, New York, called Family Foundation, which has never been approved by the New York State Commissioner of Education as a school with which school districts may contract to instruct students with disabilities. Def. Stmt. ¶¶ 21, 23; Pls. Stmt. ¶¶ 21, 23. The guiding philosophy of Family Foundation is centered on a so-called Twelve-Step program which requires students to follow a twelve-step "process of self-examination in dealing with whatever issues he or she presents." Pls. Stmt ¶ 117. This procedure strongly resembles that of Alcoholics Anonymous and incorporates religious elements. Def. Stmt. ¶ 117.

About one month later, on April 28, 2006, Defendant convoked another CSE meeting among whose participants were the CSE

chairperson, a school psychologist, a special education teacher, a standard education teacher, K.C.'s father, Plaintiffs' attorney, and the Defendant's attorney. Def. Stmt. ¶ 27; Pls. Stmt. ¶ 27. In spite of the extensive psychological testing already conducted by the Defendant, the CSE determined that more data were needed to consider K.C.'s special education eligibility and that it would be wise to evaluate K.C. at the Family Foundation, where he was relatively drug free. Def. Stmt. ¶ 28; Pls. Stmt. ¶ 28. Because both K.C. and Defendant employed different experts to conduct psychoeducational evaluations and because the report of K.C.'s expert (Dr. Petrosky) was not shared with Defendant until June 6, 2006, Defendant's expert, Dr. Hans, was prevented from conducting a complete psychological evaluation in order to avoid the "practice effect" associated with duplicative testing. Pls. Stmt. ¶ 32. Dr. Petrosky concluded that K.C. suffered from an emotional disturbance; Dr. Hans concluded that he did not suffer from one. Def. Stmt. ¶¶ 33, 35; Pls. Stmt. ¶¶ 33, 35. Dr. Petrosky further found that the supports and services offered to K.C. at Family Foundation appropriately addressed his learning, emotional, and behavioral needs. Pls. Stmt. ¶ 135.

More specifically, Dr. Hans, the presenting school psychologist, performed classroom observation at the Family Foundation and analyzed questionnaires presented to K.C.'s teachers. See IHO Findings of Fact and Decision ("IHO"), p. 18.

During his single-day observation (June 13, 2006), Dr. Hans did not mark any signs of emotional disturbance; rather, K.C.'s science teacher informed him that K.C. received good grades, was amicable, and always appeared in a fine mood. Id., p. 19. Although many Family Foundation students experience a "rough" adjustment period, this was not true for K.C., according to this teacher. Id. Then, Dr. Hans presented the "Differential Test of Conduct and Emotional Problems" ("DT/CEP") to Family Foundation's secretary who in turn provided it to the school's "family leader," Mr. McCarthy. Id., pp. 19-20. A scientific, research-based test, the DT/CEP comprises sixty true/false questions to objectively measure a student's behavior and produce an emotional disturbance scale. Id., p. 20. Based on Mr. McCarthy's response, Dr. Hans found no signs of an emotional or behavioral disorder. Nor did the doctor find such signs of disorder in the five DT/CEP responses he received from K.C.'s teachers. On the contrary, K.C. was given such encomiums as: "he has the highest grade in math class"; "he's one of my better students"; and "made a quick adjustment to his studies." Id. On the other hand, Dr. Hans never reviewed K.C.'s file from Oceanside. Id., p. 21.

To review and deliberate upon the new data, the CSE reconvened on June 16, 2006, with virtually the same participants who attended the April 28 meeting. A school psychologist named Dr. Nina Weisenreder assessed both Dr. Petrosky's and Dr. Hans' studies

and the so-called BASC-2 reports compiled by K.C. and his Family Foundation instructors. On the issue of what factor was most important in the declination of K.C.'s grades and motivation, Dr. Weisenreder opined that this issue was "clouded by the fact that he was using a great deal of drugs during this time." Pls. Stmt. ¶ 38. She also commented that "it seems quite likely the increase in drug use could lead to a decrease in academic performance." Id. She also found that Dr. Petrofsky's report--which recommended classifications of learning disability, emotional disturbance and ADHD--to be confused because, based on IQ testing, "the best estimate of [K.C.'s] cognitive ability is in the high average range." Tr[1]. 828. Finally, after discussing in detail the definition of emotional disability, the CSE decided that even if K.C. were properly diagnosed with a mood disorder recognized in the DSM-IV, classification was not warranted in view of the likelihood that his poor academic performance was more attributable to drug abuse than emotional illness. Def. Stmt. ¶ 39; Pls. Stmt. ¶ 39[2]. Furthermore, the CSE noted that, while he was abstinent from substance abuse, his classroom performance was commensurate with

---

[1] Hereinafter, "Tr." denotes the witness transcript used during the impartial hearing.

[2] Plaintiffs "deny" Defendant's assertion that "K.C.'s underachievement was due largely to drug abuse" (emphasis added). Pl. Stmt. ¶ 39. But they do not deny Defendant's assertion that the CSE found that classification was improper because the influence of K.C.'s heavy drug abuse was simply too large to overlook. Id.

his cognitive ability, which was average to high. Pls. Stmt. ¶ 41.

Unsatisfied with the CSE's classification decision, Plaintiffs' counsel sought and received an impartial hearing seeking a reversal of the unfavorable result. On June 28, 2008, an impartial hearing officer ("IHO"), relying on more than 3500 pages of hearing transcript, rendered a 158-page decision denying classification. The IHO heard testimony that although a student could have dual diagnoses of substance abuse and emotional disturbance, it would be necessary to differentiate the two. IHO, p. 21. Among other things, he found in pertinent part that:

- The April and June 2006 CSE meetings were properly composed.
- K.C. was not entitled to be classified as a child with a disability.
- Even if he were classifiable, his placement at the Family Foundation was not appropriate because the staff lacked the requisite credentials and did not provide appropriate therapeutic services for a student with an emotional disability.
- At the time of the 2006 CSE, K.C. did not suffer from emotional issues or inappropriate behaviors.
- K.C. excelled academically when he was no longer abusing drugs and when he learned, subsequent to arriving at the Family Foundation, that his parents would not divorce.
- Dr. Han's testimony was credible; Dr. Petrosky's incredible.

Def. Stmt. ¶¶ 48-54; Pls. Stmt. ¶¶ 48-54.

Based on these findings and others, the IHO denied Plaintiffs' tuition reimbursement claims for the 2005-06, 2006-07, and 2007-08 years.

Plaintiffs then appealed the IHO decision to the SRO,

who, on November 24, 2008, affirmed the IHO's determinations and dismissed in its entirety K.C.'s appeal. Pls. Stmt. ¶ 59. More specifically, the SRO found that:

- The data before the CSE were proper to render an eligibility determination (and, anyway, this objection was not properly presented).
- The April and June 2006 CSE meetings were properly composed.
- In view of K.C.'s strong academic aptitude, any decline in grades was attributable to drug abuse.
- K.C. did not have an inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
- The record did not demonstrate that K.C. engaged in inappropriate types of behavior or feelings under normal circumstances over a long period of time and to a marked degree.
- K.C. performed well when drug free.
- K.C.'s anger and aggression were closely related to his drug abuse and were compounded by his family's difficulties which emerged in February 2006.
- Any anxiety found in K.C. during his stay at the Family Foundation was the result of involuntary placement there.
- K.C. may have experienced a generally pervasive mood of unhappiness or depression in the seventh and eighth grade (coinciding with the time he abused drugs), but there was insufficient evidence that this persisted at the time of the June 2006 CSE.
- K.C. did not develop physical symptoms or fears associated with personal/school problems.
- Had K.C. been eligible for special education, Family Foundation would not have made an appropriate accommodation, since, for one thing, Dr. Petrosky's recommendation for a residential placement was based primarily on K.C.'s substance abuse.
- In any event, Family Foundation did not provide K.C. with any regular counseling services from an individual with the credentials necessary to address emotional disturbance.
- The IHO was not biased.

Def. Stmt. ¶¶ 60-80; Pls. Stmt. ¶¶ 60-80.

On March 24, 2009, Plaintiffs filed the Complaint now under consideration. <u>See</u> Docket Entry 1.

DISCUSSION

I.   <u>IDEA Standard of Review</u>

IDEA lawsuits in federal court are typically resolved through the summary judgment mechanism, based on a review of the administrative record.  But the standard of review is somewhat distinct from that applicable to ordinary summary judgment motions. <u>See</u>, <u>e.g.</u>, <u>P.K. ex rel. P.K. v. Bedford Cent. School Dist.</u>, 569 F. Supp. 2d 371, 382 (S.D.N.Y. 2008).  In particular, in the IDEA context, the existence of a factual dispute does not defeat the motion.  <u>See</u>, <u>e.g.</u>, <u>J.R. v. Bd. of Educ.</u>, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Rather, "[f]ederal courts reviewing administra- tive determinations under the IDEA must base their decisions on the 'preponderance of the evidence', taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 380 (2d Cir. 2003) <u>quoting</u> 20 U.S.C. § 1415(i)(2)(C).  In this task, the role of the reviewing federal court is "circumscribed." <u>Muller ex rel. Muller v. East Islip Union Free Sch. Dist.</u>, 145 F.3d 95, 101 (2d Cir. 1998).  Typically, this means that the Court must afford "due weight" to the administrative proceedings under review, "mindful that the judiciary generally lacks the specialized knowledge and

10

experience necessary to resolve persistent and difficult questions of educational policy." <u>Walczak v. Fla. Union Free Sch. Dist.</u>, 142 F.3d 119, 129 (2d Cir. 1998). However, this deference is not required where, as here, the question is whether the school district erred in its threshold classification decision. <u>Muller</u>, 145 F.3d at 101. In such cases, the reviewing court may conduct a <u>de</u> <u>novo</u> review of the administrative proceedings denying classification. <u>Id.</u> Be that as it may, the court must be chary of reconsidering the factual determinations of the IHO, who, on a granular level, observes witnesses' testimony, brings to bear educational expertise, and makes credibility judgments. <u>See</u>, <u>e.g.</u>, <u>M.H. v. New York City Dep't of Educ.</u>, 712 F. Supp. 2d 125, 155 (S.D.N.Y. 2010).

The party seeking relief bears the burden of proof when challenging an administrative decision. <u>See Schaffer ex rel. Schaffer v. Weast</u>, 546 U.S. 49, 51, 126 S. Ct. 528, 163 L. Ed. 2d 387 (2005).

II. <u>IDEA Eligibility</u>

IDEA was enacted "to ensure that all <u>children with disabilities</u> have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A) (emphasis added). The term "children with

disabilities" means a child "with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), <u>serious emotional disturbance (referred to in this chapter as "emotional disturbance")</u>, orthopedic impairments, autism . . . who, by reason thereof, needs special education and related services" (emphasis added). 20 U.S.C. § 1401(3)(A)(i),(ii).

To be designated as emotionally disturbed under New York Regulations, <u>see</u> 34 C.F.R. § 300.8(a)(1), a child must display at least one of the following five characteristics "over a long period of time and to a marked degree that adversely affects a student's educational performance" (<u>see</u> N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(4)):

> (i) an inability to learn that cannot be explained by intellectual, sensory, or health factors;
>
> (ii) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
>
> (iii) inappropriate types of behavior or feelings under normal circumstances;
>
> (iv) a generally pervasive mood of unhappiness or depression; or
>
> (v) a tendency to develop physical symptoms or fears associated with personal or school problems.

<u>See</u> N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(4); <u>see also</u> <u>Mr. N.C. v. Bedford Cent. School Dist.</u>, 300 Fed. Appx. 11, 13 (2d

Cir. 2008).

More importantly, however, the "emotional disturbance" category does not encompass students who are merely "socially maladjusted" without an accompanying emotional disturbance. See N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(4); see also 30 C.F.R. § 300.8(c)(4).

Before turning to an analysis of each of the five categories of emotional disturbance[3], the Court will address Plaintiffs' threshold argument that the IHO's numerous credibility determinations should be rejected as arbitrary and capricious. Pls.' Mem., p. 2. Citing to case law in the immigration context, Plaintiffs contend that the Court should reject the IHO's decision to find incredible the testimony of two of Plaintiffs' expert witnesses because it was arbitrary and capricious. Id. Plaintiffs' sole citation to a case in the IDEA context comes from a decision outside of this circuit, in which the district court held that, although a hearing officer's credibility determinations may be set aside when they are arbitrary and capricious, "normally, a finder of fact's determination of credibility receives deference on appeal, because access to live testimony is important to the credibility finding." K.S. ex rel. P.S. v. Fremont Unified School

_____

[3] Complicating the Court's analysis of these factors, the Plaintiffs fail in their briefs to adequately distinguish between them. Instead, they argue generally that K.C. meets the definition of emotional disturbance.

13

Dist., 545 F. Supp. 2d 995, 1003 (N.D. Cal. 2008) quoting Ms. S. ex rel. G. v. Vashon Island Sch. Dist. 337 F.3d 1115, 1127 (9th Cir. 2003). Assuming arguendo that such a rule were applicable within this circuit[4], the Court, like the SRO, is unconvinced by Plaintiffs' arguments for upsetting the IHO's credibility determinations for the two witnesses about whom Plaintiffs complain, Howard Riesel and Dr. Petrosky.

With respect to Mr. Riesel, Plaintiffs assert that, "realizing how damaging Riesel's testimony was to the District's case, the IHO discredited him by fabricating a story that went beyond everyone's imagination." Pls. Mem., p. 4. The first part of this argument--"realizing how damaging Riesel's testimony was"--comes close to implying that the IHO was results-oriented and biased in favor of Oceanside. This argument was soundly and thoroughly rejected in a lucid, well-reasoned opinion by the SRO, who found, among other things, that K.C.'s parent's position ultimately amounted to little more than a disagreement with the IHO's decision. See SRO Decision, p. 11. Second, the IHO's

---

[4] The Court notes in this regard that the Fremont Unified School Dist. court cogently holds that since decisions by immigration judges receive greater deference than decisions by administrative judges in the IDEA context, it follows that an arbitrary and capricious exception to deference in the former case would seem to necessarily apply in the latter case. Fremont Unified School Dist., 545 F. Supp. 2d at 1003 n. 4.

"fabricating [of] a story" to which Plaintiffs allude[5] is little more than speculation that the IHO makes in passing and which is not a crucial part of his analysis of whether Mr. Riesel's testimony was to be credited on the question of whether K.C. suffered from an emotional disturbance at the time of the April 2006 CSE meeting.  <u>See</u> IHO, p. 90.  In any event, a review of the decision shows that the IHO made several reasonable unfavorable credibility determinations regarding Mr. Riesel, including that:

(1)    Mr. Riesel implausibly testified that all of K.C.'s anger, anxiety, and depression issues "were immediately apparent <u>from the minute he walked in the door</u>" (emphasis added).  Tr. 1224.

(2)    Mr. Riesel testified that K.C. suffered from depression at GCCH, but based this statement virtually exclusively on a comment made to him by a Family Foundation psychiatrist who evidently never made a formal diagnosis of depression but instead merely made reference to a possible diagnosis of depression in her notes.  Tr. 1539.

(3)    Mr. Riesel proved incapable of distinguishing between where K.C.'s major substance abuse problem ended and

_____

[5] In their opposition brief, Plaintiffs complain of the IHO's "fabricated lunacy."  Pls. Mem., p. 4.  The Court advises Plaintiffs' counsel that it is neither necessary nor appropriate in court filings to employ such ad hominem attacks, but it is especially unfortunate when advocating on behalf of a client who is endeavoring to demonstrate a type of mental illness.

where his emotional disturbance problem began (and of knowing which was cause and which was effect, if even there was any causal relationship). IHO, p. 86.

And, perhaps most importantly,

(4) Mr. Riesel mailed a series of letters to the CSE, Plaintiffs' counsel, and others, in which his diagnoses of K.C.'s illnesses would mysteriously change from one letter to the next. IHO, p. 91.

Among other credibility determinations, the Court finds that it was these which motivated the IHO, not his "fabricated lunacy." Pls. Mem., p. 4.

As for the IHO's negative credibility determinations of Dr. Petrosky, Plaintiffs argue that they were bereft of any substantial factual basis. At the outset, the Court notes that the IHO devoted no less than thirty-three single-spaced pages of analysis to the implausibilities he finds in Dr. Petrosky's testimony and research. IHO, pp. 94-127. While this does not necessarily preclude a finding here that the hearing officer lacked specific and cogent reasons for his credibility determinations, it certainly makes such a finding considerably less likely given the IHO's thoroughness. Because the IHO's credibility determinations on this score largely overlap with his analysis of the five emotional disturbance factors, the Court will assess both (Petrosky's credibility determination and the five factors)

16

together in the subsections that follow.

A.  "An Inability to Learn that Cannot be Explained
    by Intellectual, Sensory, or Health Factors"

Before K.C. began abusing drugs in the 7th and 8th grade, his parents reported that he "did okay" in the 6th grade.  Tr. pp. 1564, 1570.  Similarly, it is undisputed that once K.C. began abstaining from drug abuse, his academic performance improved in a pronounced fashion, with his grades rising and his future academic prospects turning around (he entered an honors program in a community college following graduation in June 2008).  See SRO, p. 18 citing Dist. Ex. 6 at pp. 2-3.  Therefore the evidence adduced before the IHO showed that before K.C.'s heavy drug abuse his grades were mediocre; that during the period when he daily abused drugs he failed several classes; and that after he vanquished his drug habit, his classes were going quite well.  Morever, as indicated supra, even during his heavy drug phase, Oceanside found that K.C.'s overall cognitive functioning was average; his processing skills were in the borderline range; his decoding, math, spelling, and listening comprehension skills were average; and his oral expression skills were in the superior range.  Def. Stmt. ¶¶ 8-10;  Pl. Stmt. ¶¶ 8-10.

Plaintiffs argue that K.C. meets this element of emotional disturbance as a matter of law in that on March 1, 2005, the Defendant deemed K.C. eligible under Section 504 and accordingly issued him a Section 504 plan.  To do this, Plaintiffs

argue, is to admit that K.C. suffered from a physical or mental impairment that substantially limited one or more of his major life activities. <u>See</u> Pls.' Mem., p. 10. Plaintiffs note that the Section 504 regulation--34 C.F.R. 104.3 (j)(2)(i)--"defines a physical or mental impairment as any physiological disorder or condition, or any mental or psychological disorder, such as . . . emotional or mental illness. The ADA Amendments Act states that 'major life activities include [] caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing [], speaking, breathing, <u>learning</u>, <u>reading</u>, <u>concentrating</u>, <u>thinking</u>, <u>communicating</u>, and <u>working</u>.'" <u>Id.</u> But an admission that K.C. suffered from a mental or emotional impairment under Section 504 is not--and cannot be--an automatic admission that K.C. was classifiable under the IDEA. For one thing, that would render redundant one of the statutes; for another, the requirements for establishing emotional disturbance under the IDEA are distinct from those to establish Section 504 coverage. <u>See</u> N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(4); <u>see also</u> <u>Maus v. Wappingers C.S.D.</u>, 688 F. Supp. 2d 282, 287-88 (S.D.N.Y. 2010) (explaining that the Rehabilitation Act is broader in scope than the IDEA such that a student could qualify under Section 504 and yet not be entitled to special education services under the IDEA).

In light of such evidence, the Court cannot upset the judgements of both the IHO and the SRO--Plaintiffs have not

established by a preponderance of the evidence that K.C. suffered from "an inability to learn that cannot be explained by intellectual, sensory, or health factors." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(zz)(4)(i).

B. <u>"An Inability to Build or Maintain Satisfactory Interpersonal Relationships with Peers and Teachers"</u>

To assess K.C.'s ability (or lack thereof) to build or maintain satisfactory interpersonal relationships with peers and teachers, Dr. Petrosky conducted six Oceanside teacher evaluations for K.C.'s parents. <u>See</u> IHO, p. 99. Although the evaluations, among other tests, led Dr. Petrosky to conclude that K.C. suffered from an emotional disturbance, the IHO found both that the tests demonstrated just the opposite and that Dr. Petrosky's interpretations of them discredited his testimony overall. IHO, p. 100-02. For example, the IHO noted that while Dr. Petrosky conceded that three teachers reported "positive social functioning" and three others "poor social functioning", one of the teachers in the latter category actually stated that K.C. "[g]<u>ets along with most students but</u> is often argumentative" (emphasis in original). IHO, p. 99. Dr. Petrosky self-servingly bowdlerized the underscored portion of the teacher's response to bolster his conclusion, the IHO found. Likewise, where Dr. Petrosky writes "collectively, [K.C.'s] teachers . . . characterized him as unkempt, appearing tired, being disorganized, and lacking effort and completion of his work," the IHO notes that when the teacher's

responses are closely examined, only two of the six teachers made such remarks--hardly enough to say that all of them "collectively" felt this way. As a further example of massaging the data, Dr. Petrosky reported that "a majority (4 of 6) report observing additional signs of disturbance, specifically in the realm of social functioning (i.e., socially awkward, withdrawn, low peering interaction, argumentative and externalization of blame)." The quote strongly (but deceptively) implies that four teachers attached all, or most, of the listed pejorative adjectives to K.C., but they in fact did not. IHO, p. 100.

Quite apart from the IHO's reasonable credibility determination, ample evidence before the IHO (and the SRO) showed a side of K.C. inconsistent with this aspect of an emotional disturbance classification. The March 2005 CSE meeting minutes, for instance, say that K.C. was "quite popular" and got along well with his coevals. See SRO, p. 19, citing Parent Ex. X at p. 2. Although a couple of K.C.'s eighth grade teachers employed the term "socially awkward" to describe him, others remarked on his joviality around friends and his positive social skills. Id. Mr. Riesel, the program coordinator for GCCH, testified that K.C.'s ability to positively interact with peers varied but was generally adequate. See SRO, p. 19, citing Tr., p. 1544. Echoing that sentiment, K.C.'s mother testified that while at GCCH, "he seemed to get along fine with the kids from what I was told, and I never heard otherwise."

Tr., p. 1616.  And if it cannot be said that K.C.'s GCCH stay was without incident (Riesel testified that at times he was "explosive". Tr., p. 1943), nor can it safely be said that this behavior was not primarily fueled by K.C.'s abuse of drugs which continued through his stay at GCCH.  Tr., p. 2061.  Observed in school at the Family Foundation in the spring of 2006 when he had beaten his drug habit, K.C. was engaged and attentive in class, interacted well with fellow students with whom he was friends, and was indeed a role model. Tr., p. 364; 1282-83; 1652.  Above all, he was "happy, motivated." Tr., p. 1652.  Lastly, Dr. Petrosky himself documented that, in May 2006, K.C.'s parents commented on how he had succeeded in making friends and that he got along with adults unless accused of something.  <u>See</u> SRO, p. 19 <u>citing</u> Parent Ex. H at p. 2.

Considering the above evidence and in view of the fact that Plaintiffs do not clearly and expressly argue this element of emotional disturbance in their briefs, the Court declines to upset the IHO's credibility determinations on this point.  It finds that Plaintiffs have not established by a preponderance of the evidence that K.C. met the definition of this factor at the time of the June 2006 CSE.

C.    <u>"Inappropriate Types of Behavior or Feelings under Normal Circumstances"</u>

The inappropriate types of behavior or feelings under normal circumstances flagged by Dr. Petrosky fell under two broad categories: (1) K.C.'s elevated anger and aggressive attitudes and

21

behavior; and (2) his pre- and post-substance abuse anxiety
symptoms. See Parent Ex. H at 23. With respect to the first
category, Dr. Petrosky cited instances of K.C.'s anger and
aggression toward his parents and staff at the GCCH, all of which
had foundation in the record. See SRO, p. 19. However, as both the
SRO and IHO correctly noted, in spite of the doctor's assertion that
these examples of K.C.'s anger under normal circumstances transpired
after approximately seven weeks of complete abstinence from drugs
and alcohol, his report reveals that these examples actually
occurred when K.C. was still abusing drugs but were recorded after
his eventual abstinence. See SRO, p. 20. Furthermore, the parents'
BASC-2 responses were based on K.C.'s behavior prior to complete
abstinence. Tr., p. 3116. Additionally, the BASC responses from
K.C.'s mother and two of his Family Foundation teachers scored K.C.
in the averaged range for aggression. Tr., p. 3115-3116. Finally,
both the SRO and IHO found that the aggression and anger cited by
Dr. Petrosky--and chalked up by the doctor as inappropriate under
normal circumstances--coincided with intense family strain at a time
when it looked as though K.C.'s parents would divorce. See Parent
Exs. H at p. 3; FF.

As for Dr. Petrosky's diagnosis of an anxiety disorder
that pre- and post-dated K.C.'s substance abuse, the IHO found that
the evidence failed to show a condition that constituted an
inappropriate type of behavior under normal circumstances--"[i]t is

normal behavior for teenagers to be preoccupied with what their peers think of them." IHO, p. 110 <u>citing</u> Tr. 258-61. Among other things, Dr. Petrosky's diagnosis was based on the facts that K.C. voiced anxiety over walking alone in the halls at the beginning of seventh grade; that he fretted about being called upon to read passages aloud in class; and that K.C. yielded BASC-2 "T" scores of 67 on the anxiety scale and 64 on the social stress scale. Tr. 2567; 1583. More importantly, the doctor decided that this anxiety began one month prior to K.C.'s pattern of drug abuse. Parent Ex. H., p. 20. Yet, as both the IHO and SRO observe, these facts mask as much as they reveal. First, although the anxiety scale score of 67 is worrisome, Dr. Petrosky did not report the BASC anxiety scores of the father, mother, or K.C.'s earth science teacher at the Family Foundation. IHO, p. 107. K.C.'s English teacher, moreover, reported a relatively low score of 60. <u>Id.</u> Second, at around the same time these BASC-2 scores were recorded, K.C. was observed in school by Dr. Hans, who found him at ease in class, calm, interactive, and engaged. SRO, p. 20 <u>citing</u> Dist. Ex. 6, p. 1. Dr. Hans also testified that it would be improbable for K.C. to suppress characteristics of anxiety at the Family Foundation for more than a fleeting, brief period of time. Tr. 1370-71; 1374.

Third, the IHO found that Dr. Petrosky gave short shrift to the circumstances attending K.C.'s arrival at the Family Foundation when his anxiety levels were measured after abstaining

23

from drugs. IHO, p. 111. Specifically, the IHO notes that unmentioned in the doctor's analysis are the facts that K.C.'s parents "tricked their son to go with them that day," id. citing Tr. 2525; that "only when their car arrived at Family Foundation did the student realize he wasn't going home," id. citing Tr. 2526; and that K.C. knew no one at his new school and was not allowed for an entire month to contact anyone in his home, id. citing Tr. 2526. Dr. Petrosky failed to explain why these factors, which would traumatize any teenager, constituted inappropriate behaviors under normal circumstances. Meanwhile, Mr. Jeffrey Brain, a Family Foundation school psychologist, testified that when any teenager enters a new academic setting where others have already acclimatized themselves, withdrawal symptoms are not uncommon. IHO, p. 112 citing Tr. 258-61. Dr. Petrosky himself testified somewhat inconsistently that "students typically get nervous when speaking in front of a class." Tr. 3369.

In view of the above considerations, the Court will not upset the findings of the IHO and SRO that K.C. failed to establish that, at the time of the June CSE meeting, he suffered from inappropriate types of behavior or feelings under normal circumstances to a marked degree and over a long period of time, adversely affecting academic performance.

D.  "A Generally Pervasive Mood of Unhappiness or Depression"

Although this factor appears to be a closer call than

24

those assessed supra, the Court nevertheless determines that the considered judgments of the IHO and SRO should be left intact. At the outset, the Court notes that in his May 2006 evaluation, Dr. Petrosky concluded that K.C. satisfied the criteria for emotional disturbance under the second, third, and fifth characteristics of the definition--but not the fourth: "a generally pervasive mood of unhappiness or depression." SRO, p. 21 citing Parent Ex. H, p. 22-23. True, in December 2004 K.C.'s teachers variously described K.C. as lethargic, unkempt, socially awkward, argumentative, disorganized, and with low self-esteem. See Pls.' Mem., p. 11 n. 24. And when K.C. entered the GCCH program in August 2005, his mood was described as dysthymic and physician notes from the time suggest feelings of anxiety and depression. Tr., p. 1539.

Yet Dr. Petrosky's May 2006 assessment--conducted very close in time to the June CSE, the relevant time period--reveals three BASC-2 teacher responses that characterized K.C.'s depressive behavior as being in the "average" range. Tr., p. 3123-26; Parents Ex. H, p. 29-31. Dr. Hans' DT/CEP testing concluded that K.C. was "not perceived a potential risk of emotional disturbance." SRO, p. 22 citing Dist. Ex. 6 at p. 2. Indeed, one of K.C.'s science teachers at Family Foundation stated that he "always appears to be in a good mood." Id.

Further confounding Plaintiffs' argument that this Court should reverse the decisions of the IHO and SRO is the fact that

virtually all of the evidence pertaining to K.C.'s generally pervasive mood of unhappiness or depression over a long period of time and to a marked degree that adversely affects his educational performance coincides with the period when K.C. abused drugs and alcohol. Tellingly, after K.C. completely ceased his drug abuse, all of the positive effects described _supra_, including improved mood and academic performance, occurred. Of course, it is conceivable that these benefits flowed from Family Foundation's Twelve-Step program, but the Court is unpersuaded by the amount of proof adduced to show such causation. (Then again, the speed with which K.C.'s putative emotional disturbance symptoms went into remission at Family Foundation might as well suggest that the condition was never experienced to a marked degree.) Rather, the evidence before the IHO and SRO showed that K.C. confided to Dr. Petrosky that in the seventh grade--_i.e._, when K.C. was reportedly "lethargic" and "unkempt"--he smoked three grams of marijuana a day; that from June of his seventh grade school year to December of his eighth grade school year, he smoked one half of an ounce of marijuana virtually every day; and that from February to March 2006, he smoked three quarters of an ounce of marijuana every day. IHO, p. 103 <u>citing</u> Parents Ex. H, p. 11. Even if K.C. were exaggerating or miscalculating the staggering amount of drugs he was abusing in this period to Dr. Petrosky, the Court finds that the IHO and SRO reasonably concluded that the strong evidence of K.C.'s pervasive

drug abuse outweighed the evidence showing that, rather than the drugs, it was K.C.'s emotional disturbance which adversely affected his educational performance. That it is not unprecedented or, indeed, uncommon for the problems of drug abuse and emotional disturbance to co-exist (and exacerbate or beget one another) neither relieves the Plaintiffs of their obligation to show that it was the emotional disturbance which adversely affected educational performance nor renders incorrect the decision of the IHO that the weight of the evidence showed that it was drugs rather than emotional disability behind K.C.'s academic decline. See, e.g., P.K. ex rel. P.K. v Bedford Cent. School Dist., 569 F. Supp. 2d 371, 386 (S.D.N.Y. 2008) (recognizing that substance abuse and emotional disturbance need not be "inextricably intertwined").

Accordingly, the Court will not reverse the IHO's decision on this criterion.

E.   "A Tendency to Develop Physical Symptoms or Fears Associated with Personal or School Problems"

Dr. Petrosky opined in his May 2006 report that K.C. demonstrated present and past somatization (converting anxiety into physical symptoms), that this was due to personal and school problems, and that symptoms of this problem were manifest before K.C.'s drug abuse problem began. SRO, p. 22 citing Parents Ex. H, p. 23. Partly as a consequence, K.C. missed 34 days of school in the seventh grade. Based on this evidence, and on the BASC-2 response of K.C.'s father who reported a marked amount of somatic

27

complaints, Dr. Petrosky concluded that K.C. met the definition of this emotional disturbance criterion.

For several cogent reasons, the IHO and SRO declined to completely credit Dr. Petrosky's conclusions. For one thing, apart from K.C.'s father's, the other BASC-2 responses scored K.C.'s somatization in the average range, particularly those which assessed K.C. after he began abstaining from drugs. SRO, p. 22 <u>citing</u> Parent Ex. H, pp. 29-31. More importantly, many of the instances of purported somatization--for example, his 34 days of missed school in the seventh grade--were in fact legitimate illnesses (including strep throat and a viral infection) diagnosed by physicians who wrote notes for K.C. with which to furnish the school district. SRO, p. 22 <u>citing</u> Parent Ex. W, p. 3.

In sum, the Court finds that the IHO's and SRO's determinations were the correct ones.

III. <u>The Appropriateness of the Family Foundation as a Placement for K.C.</u>

Even if the Court were to reverse--which it does not--the IHO's decision finding that K.C. does not meet the emotional disturbance criteria, Plaintiffs would have to establish that their unilateral placement of K.C. at the Family Foundation was appropriate. In particular, Plaintiffs must establish that (1) the IEP proposed by the school district was inappropriate, and (2) the private placement was appropriate to meet the child's special needs. <u>Frank G. v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356, 363-64 (2d Cir.

2006).  More precisely, the parents of the disabled child bear the burden of demonstrating that their placement offers "education instruction specifically designed to meet the unique needs of a handicapped child, supported by such services as are <u>necessary</u> to permit the child to benefit from instruction."  (emphasis added) <u>Id.</u> at 365.  The pertinent standard is whether the totality of the circumstances establishes that the placement reasonably serves the child's unique needs.  <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 112 (2d Cir. 2007).

Here, both the IHO and the SRO found that the Plaintiffs failed to carry this burden.  <u>See</u> IHO, pp. 128-144; SRO, p. 23.  As stated above, the Family Foundation has never been approved by the New York State Commissioner of Education as a school with which school districts may contract to teach disabled students.  Def. Stmt. ¶¶ 21, 23; Pl. Stmt. ¶¶ 21, 23.  This is not to say that in such circumstances parents may never receive reimbursement, <u>see Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7, 14, 114 S. Ct. 361, 126 L. Ed. 2d 284 (1993), but it is far from irrelevant to the inquiry.  The school's program is predicated on an Alcoholics Anonymous-style twelve-step procedure for resolving addiction issues.  Def. Stmt. ¶ 24; Pl. Stmt. ¶ 24.  Yet case law holds that IDEA does not require (already heavily burdened) public-school districts to pay for private substance-abuse treatment.  <u>See</u>, <u>e.g.</u>, <u>P.K.</u>, 569 F. Supp. 2d at 386.

While it is true enough that K.C. made academic and emotional progress at the Family Foundation, "such progress does not itself demonstrate that a private placement was appropriate." Gagliardo, 489 F.3d at 115. Rather, the question is whether the placement was "supported by such services as are <u>necessary</u> to permit the child to benefit from instruction" (emphasis added). <u>Frank G.</u>, 459 F.3d at 365. <u>Omidian v. Bd of Educ. of the New Hartford C.S.D.</u>, No. 05-CV-0398, 2009 WL 890625, *28 (N.D.N.Y. Mar. 1, 2009) is on all fours with this case. There, the court held that:

> although the Family Foundation utilized the twelve-step program to treat any "difficulty" a student at the Family Foundation might have, and there was evidence that this program met K.O.'s need for substance abuse counseling, there is no evidence that it satisfied K.O.'s need for professional counseling to "address the emotional and behavioral needs that affect his educational progress." Dr. Doberman testified that, in his opinion, the twelve step program could be one element of a program to address mood disorders, but, alone, was insufficient without the involvement of behavioral specialists.

<u>Id.</u> at *28.

Identically, the SRO here found that the Family Foundation's academic vice president conceded that the chief group activity practiced at the school (called "table topics") is a form of mentoring rather than of professional counseling tailored for a person suffering from emotional disturbance. SRO, p. 23 <u>citing</u> Tr. 73-74. He further found that the record was without evidence that K.C. was actually provided with any regular, one-to-one counseling

services administered by a person with professional credentials. SRO, p. 23. (In this regard, Mr. Brain, the Family Foundation psychologist, testified that he trained staff members in the foundation's "four absolutes: honesty, unselfishness, purity and love." Tr. 249; similarly, the academic vice president of Family Foundation testified that the school is an "emotional growth high school and college prep school." Tr. 63.) What is more, the IHO noted that Dr. Petrosky, whose report argued that the Family Foundation was an appropriate placement for a child with K.C.'s unique needs, never investigated the certification, licensing, or credentials of K.C.'s "family leader", the student's "primary person" with respect to counseling. IHO, p. 139 citing Tr. 226; 3228. Moreover, Dr. Petrosky did not know whether the family leader or K.C.'s sponsor were qualified to offer individual therapy. Id., p. 141 citing Tr. 2277. The IHO then found that Dr. Petrosky's testimony on the efficacy of the "table topics" procedure was not only evasive and obfuscatory, id., pp. 141-42, but inconsistent with that of Plaintiffs' other witness, Mr. Riesel. Id., p. 144. When asked whether "a person who had only a college degree in psychology would not be appropriate to give K.C. the necessary services he needed," Mr. Riesel replied, "Yes . . . Because a person who only has a college degree is not--in psychology, for example, is not really equipped to provide psychotherapy or counseling [to] K.C." Id., p. 144 citing Tr. 2084. Inconsistently, Plaintiffs' other

31

witness, Dr. Petrosky, testified that a Family Foundation teacher without any specific academic training--let alone a graduate degree--could effectively utilize the principles of cognitive behavioral therapy in a table topics session.  Tr., p. 2274-75.

On balance, then, the Court finds that Plaintiffs have neither made the case for finding Dr. Petrosky's credibility determination arbitrary and capricious nor satisfied their burden of showing that the Family Foundation, under the totality of the circumstances, was "<u>necessary</u> to permit the child to benefit from instruction" (emphasis added).  <u>Frank G.</u>, 459 F.3d at 365.

IV.  <u>Section 504 Rehabilitation Act Claim</u>

Unlike in the case of Plaintiffs' IDEA claim, summary judgment is appropriate in the case of their Rehabilitation Act claim only if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); <u>see also</u> <u>Pinn ex rel. Steven P. v. Harrison Central School Dist.</u>, 473 F. Supp. 2d 477, 483 (S.D.N.Y. 2007).

To recover under the Rehabilitation Act, Plaintiffs must demonstrate that K.C.: (1) is a disabled person under the Act; (2) has been excluded from benefits of a federally funded program or special service; (3) <u>because of</u> his disability.  <u>Mrs. C. v. Wheaton</u>, 916 F.2d 69, 74 (2d Cir. 1990) (emphasis added).  Where, as here, a plaintiff endeavors to satisfy the second prong by showing a denial of FAPE under the IDEA, he cannot merely show a violation of IDEA; rather, he must prove bad faith or gross misjudgment.  <u>Gabel</u>

32

ex rel. L.G. v. Bd. of Educ., 368 F. Supp. 2d 313, 334 (S.D.N.Y. 2005); Pinn, 473 F. Supp. 2d at 483.

The crux of Plaintiffs' Section 504 claim is that, by deeming K.C. eligible for a Section 504 accommodation on March 1, 2005, the Defendant "knew . . . that K.C. had a disability and yet . . . denied him access to an appropriate education." Pls. Mem., p. 24 (emphasis in original). Of course, to assert that the Defendant partly acknowledged K.C.'s Section 504 eligibility is not to allege--let alone to create a genuine dispute--that in deciding not to separately classify K.C. under the IDEA the Defendant demonstrated bad faith of gross misjudgment. Moreover, now that this Court has denied Plaintiffs' request to reverse the state administrative decisions denying K.C.'s IDEA classification, no less than four administrative and judicial bodies (the CSE, IHO, SRO, and this Court) have determined that, so far from exhibiting bad faith or gross misjudgment, the Defendant was correct in its decision not to classify K.C. Put another way, Plaintiffs have failed to establish the predicate to a showing of bad faith or gross misjudgment--that there was a violation of IDEA in the first place. See Pinn, 473 F. Supp. 2d at 484. More generally, Plaintiffs offer no evidence that Defendant "denied [K.C.] access to an appropriate education" (Pls. Mem., p. 24) because of his disability. See Wheaton, 916 F.2d at 74. As in Pinn, "Plaintiffs Rehabilitation Act claims are, in actuality, merely restatements of their IDEA

claims-that Defendant failed to appropriately classify [the plaintiff]. Summary judgment is therefore appropriate." 473 F. Supp. 2d at 484.

CONCLUSION

For the foregoing reasons, with respect to all of Plaintiffs' claims, the Court GRANTS Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Clerk of the Court is directed to terminate all pending motions and mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    May __24__, 2011
          Central Islip, New York